

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

        v.

HOWARD HINKLE, JR.,

        Defendant.

_____

*23-MR-469*

23-MJ-5219

## NOTICE OF MOTION AND MOTION FOR STAY AND REVOCATION OF MAGISTRATE JUDGE'S DETERMINATION ON DETENTION

The United States of America by and through its attorney, Trini E. Ross, United States Attorney for the Western District of New York, and Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, of counsel, pursuant to Title 18, United State Code, Section 3145(a)(1), hereby files a Motion with the United States District Court in the Western District of New York, the Honorable John L. Sinatra presiding, for an Order revoking the Decision and Order entered by Magistrate Judge Michael J. Roemer on October 26, 2023; and the government further moves for an Order staying said Order of the magistrate judge until such time as the Court can hear and determine the government's motion for review of the magistrate judge's determination on detention.

**IN SUPPORT THEREOF**, the government sets forth a memorandum, incorporated herein by reference.

**WHEREFORE**, it is respectfully requested that the Court (1) stay the order of the magistrate judge releasing the defendant until such time as the District Court can hear and determine this motion; and (2) revoke Magistrate Judge Michael J. Roemer's October 24, 2023, release order.

DATED:  Buffalo, New York, October 27, 2023.

TRINI E. ROSS
United States Attorney

By:        s/JOSEPH M. TRIPI
s/NICHOLAS T. COOPER
s/CASEY L. CHALBECK
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716.843.5839
Joseph.Tripi@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        v.

HOWARD HINKLE, JR.,

        Defendant.

23-MJ-5219

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO REVOKE THE MAGISTRATE JUDGE'S DECISION AND ORDER

The United States of America by and through its attorneys, Trini E. Ross, United States Attorney for the Western District of New York, and Joseph M. Tripi, Nicholas T. Cooper, and Casey L. Chalbeck, Assistant United States Attorneys, of counsel, hereby file this Memorandum of Law in Support of its Motion to Revoke the Magistrate Judge's Decision and Order.

### I.    INTRODUCTION AND BACKGROUND

This case is related to the investigation into the death of a federal witness who was scheduled to testify in an upcoming trial—and who died under highly suspicious circumstances.[1]  Pursuant to a federal search warrant, at approximately 6:00 a.m. on October 24, 2023, the Federal Bureau of Investigation ("FBI") conducted a search of Howard Hinkle, Jr.'s residence at 4290 Donovan Road, Alma, New York.  Owing to the FBI's (well-founded) concerns that Mr. Hinkle would be armed and dangerous, an FBI

---

[1]    As the government has emphasized in other cases, the investigation is ongoing. *See* Redacted Govt's Sur-Reply to Def.'s Mem. of Law in Further Support of Mot. for Pre-Trial Release at 16 n.7, 1:19-CR-227-LJV, ECF No. 642, (filed Oct. 10, 2023).

Special Weapons and Tactics ("SWAT") team was engaged to "clear" Mr. Hinkle's residence.  Mr. Hinkle initially failed to follow the SWAT team's instructions and acted in a manner consistent with that of someone contemplating an armed standoff with the FBI. When Mr. Hinkle, a violent felon, finally surrendered, the SWAT team discovered 19 firearms—some of which were loaded—throughout the house, a proliferation of ammunition, a large storage container full of marijuana, over 130 marijuana plants, and other evidence of criminal activity.

A four-count Complaint followed.  Specifically, Mr. Hinkle is charged with the following offenses: (1) unlawfully possessing a firearm in violation of 18 U.S.C. § 922(g)(1); (2) maintaining a drug involved premises in violation of 21 U.S.C. § 856; (3) possession of marijuana with intent to distribute and 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(vii); and (4) possessing a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A).

On October 25, 2023, United States Magistrate Judge Michael J. Roemer ("Judge Roemer") presided over Mr. Hinkle's Initial Appearance.  The government requested a three-day continuance.  Judge Roemer re-scheduled the detention hearing for the next day, October 26, 2023.  Following the government's proffer and oral argument, Judge Roemer ordered Mr. Hinkle's release on conditions.[2]  Judge Roemer then granted a stay— specifically, a 24-hour stay—pending this Court's review.

---

[2]         Judge Roemer largely agreed with the U.S. Probation Office's recommended conditions, but added a location restriction program, *i.e.*, home incarceration, and location monitoring. Judge Roemer declined the government's request that Mr. Hinkle be prohibited from contacting or cohabitating with his co-defendant and girlfriend, Dillon Anderson. *See* Tran. Det. Hr'g at 31, *United States v. Hinkle*, 1:23-MJ-5219 (W.D.N.Y. Oct. 26, 2023).

This Court should reverse. There are no conditions—including those set by the Magistrate Court—that can assure the safety of the community or Mr. Hinkle's appearance at trial.

## II.    STANDARD OF REVIEW

Review of a magistrate judge's release order is *de novo*. "[W]here a defendant is ordered released by a magistrate judge, the government may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court. Upon such motion, the district court must perform a *de novo* review of the magistrate judge's release order." *United States v. Boorman*, 130 F. Supp. 2d 394, 398 (W.D.N.Y. 2001) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir.1985)). Under that standard, the district owes no deference to the magistrate judge's decision but, rather, must "reach its own independent conclusion." *Leon*, 766 F.2d at 80; *see also United States v. Colombo*, 777 F.2d 96, 100 (2d Cir. 1985). Moreover, the reviewing district court is not limited to the record made within the magistrate court. Instead, the Court may take additional evidence or conduct a new evidentiary hearing altogether. *See Boorman*, 130 F. Supp. 2d at 398 ("When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence."); *see also Colombo*, 777 F.2d at 98.

## III.    LEGAL FRAMEWORK

Section 3142 of Title 18, enacted as part of the Bail Reform Act of 1984, *see* 18 U.S.C. §§ 3141–3156 ("Bail Reform Act"), requires that an accused be detained pending trial where, following a hearing in accordance with § 3142(f), "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the

person as required and the safety of any other person and the community." 18 U.S.C. §
3142(e)(1).

Subsection (e) of § 3142 provides that there is a rebuttable presumption that "no
condition or combination of conditions will reasonably assure" against flight or danger
where probable cause supports a finding that the person seeking bail committed certain
types of offenses, including "an offense for which a maximum term of imprisonment of ten
years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.)," 18
U.S.C. § 3142(e)(3)(A), or "an offense under [18 U.S.C. §] 924(c)," *id.* § 3142(e)(3)(B).
Where there is such a presumption, the defendant "bears a limited burden of production—
not a burden of persuasion—to rebut that presumption by coming forward with evidence
that he does not pose a danger to the community or a risk of flight." *United States v.
Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).  Notably, even if a defendant carries this burden
of production, the significance of the presumption does not disappear.  Rather, "it 'remains
a factor to be considered among those weighed by the district court.'" *United States v.
English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *Mercedes*, 254 F.3d at 436)).

The factors that the judicial officer must consider "in determining whether there are
conditions of release that will reasonably assure the appearance of the person as required
and the safety of any other person and the community," include "the nature and
circumstances of the offense charged, including whether the offense is a crime of violence,"
or involves a firearm; "the weight of the evidence against the person"; "the history and
characteristics of the person," including his "physical and mental condition, family ties,
employment, financial resources, length of residence in the community, community ties,

past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings"; and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). Importantly, the same factors are to be considered in determining "whether the presumptions of dangerousness and flight are rebutted." *Mercedes*, 254 F.3d at 436.

Finally, "[t]he facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." *Id.* § 3142(f)(2); *see also United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir. 1985) (noting that the government ""has the burden of establishing defendant's dangerousness by clear and convincing evidence"). That burden relaxes, however, where the government moves for detention based upon a risk of flight. Under those circumstances, the government need only establish by a preponderance of the evidence that the defendant "if released, presents an actual risk of flight." *United States v. Sabhnani*, 493 F.3d 63, 75 (2d. Cir. 2007) (citation omitted).

## IV.   ARGUMENT

Mr. Hinkle should be detained. For starters, he cannot carry his limited burden to rebut the presumption that "no condition or combination of conditions will reasonably assure" against danger or flight. § 3142(e). But, irrespective of the presumption, the government can show by clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of the community upon his release. And, likewise, it can show by the preponderance of the evidence that Mr. Hinkle presents a flight

risk.[3] Finally, though the U.S. Probation Office has recommended release, the government notes that the factors guiding USPO's evaluation of dangerousness and risk of flight do not mirror those mandated by Bail Reform Act.

### A. Under the Bail Reform Act, Detention is Presumed, and Mr. Hinkle Cannot Rebut That Presumption

Mr. Hinkle cannot overcome the Bail Reform Act's presumptions under 18 U.S.C. §§ 3142(e)(3)(A) and (e)(3)(B) that no condition or combination of conditions will reasonably assure the safety of the community and his appearance if he is released.

By way of background, those presumptions are triggered in three respects. First, Mr. Hinkle's drug-distribution charge triggers the statutory presumption under § 3142(e)(3)(A) because the maximum term of imprisonment is 40 years. *See id.* § 3142(e)(3)(A) (providing that the presumption applies to "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act"); 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii) (providing a 5-year mandatory minimum and 40-year maximum term of imprison possessing with intent to distribute 100 or more marijuana plants). Second, even if Mr. Hinkle were not charged with drug distribution, he is charged with maintaining a drug-involved premises, which carries a maximum term of imprisonment of twenty years. And, third, the presumption articulated in § 3142(e)(3)(B) independently flows from his charge

---

[3] Although the evidence presented at the detention hearing was not as extensive as the information that follows—primarily due to the fact that the information presented should have been sufficient to warrant detention and evidence of Mr. Hinkle's risk of flight and dangerousness continues to come in as evidence of the search is processed—the government now sets forth further basis for the defendant's detention. As the law allows, the Government asks the Court to consider this additional evidence in support of its motion. *See United States v. Boorman*, 130 F. Supp. 2d 394, 398 (W.D.N.Y. 2001) (holding the court may consider additional evidence beyond what was presented at a detention hearing when reviewing a release order).

under 18 U.S.C. § 924(c)(1)(A)).  *See* § 3142(e)(3)(B) (providing that an offense under § 924(c) triggers the statutory presumption).

Mr. Hinkle's arguments to overcome the presumption are unavailing.  During the October 26, 2023, detention hearing, Mr. Hinkle principally relied on his close ties to Wellsville, New York to rebut the presumption in favor of detention and claimed that the massive quantities of marijuana were intended for personal consumption.  Neither contention constitutes "evidence that he does not pose a danger to the community," and is thus insufficient to rebut the presumption. *Mercedes*, 254 F.3d at 436.

First, evidence of Mr. Hinkle's close ties to Western New York does nothing to rebut the presumption of dangerousness, as it was not "evidence contrary to the presumed fact[s]"—extensive drug distribution and possessing a firearm in furtherance of drug trafficking—that trigger the presumption in the first instance. *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991).  Indeed, it speaks to only one of the § 3142(g) factors that guide the Court's determination of whether the "presumptions . . . are rebutted," and even then is of limited relevance to the Bail Reform Act's dangerousness considerations. *Mercedes*, 254 F.3d at 436.

For that reason, other courts in this district have found the presumption unrebutted under comparable fact patterns.  For instance, in *United States v. Thompson*, 436 F.Supp.3d 631 (W.D.N.Y. 2020) (Wolford, C.J.), the defendant was charged with firearm and drug-related offenses, including being a felon in possession of firearms, maintaining a drug-involved premises, and possession of firearms in furtherance of drug trafficking, all in violation of 18 U.S.C. § 922(g)(1), 21 U.S.C. § 856(a)(1), and 18 U.S.C. § 924(c)(1)(a)(i),

respectively.  Also, like Mr. Hinkle, the *Thompson* defendant proffered that he "has strong ties to the . . . communit[y]."  *Thompson*, 436 F.Supp.3d at 638.  Nevertheless, the Court concluded that this factor, along with the defendant's proffer of "assets that could be utilized to secure his release . . . . d[id] not rebut the presumption in favor of detention."  *Id.*

That same conclusion applies here.  Like the *Thompson* defendant, Mr. Hinkle is charged with drug and firearm offenses, including being a felon in possession of firearms, maintaining a drug-involved premises, and possession of firearms in furtherance of drug trafficking.  And, like the *Thompson* defendant, Mr. Hinkle urged that his strong community ties rebutted the presumption in favor of his detention.  That proffer was not enough in *Thompson*, and it is not enough here.   *See Thompson*, 436 F.Supp.3d at 638; *Mercedes*, 254 F.3d at 436.

Second, Mr. Hinkle's dubious claim that he intended to personally consume the marijuana from the 130+ marijuana plants discovered on his property cannot aid in his efforts to rebut the presumption.  Circuit courts across the United States—including the Second Circuit—have rightfully rejected similar arguments.  *See, e.g., Proyect v. United States*, 101 F.3d 11, 13 (2d Cir. 1996) (observing that it was "very unlikely that [a defendant convicted of growing more than 100 marijuana plants] personally intended to consume all of his crop"); *see also United States v. Emmons*, 24 F.3d 1210, 1215 (10th Cir. 1994) (concluding that "the large quantity of marijuana discovered during . . . two expeditions onto [the] property" was "an amount totally at odds with purely personal consumption"); *United States v. Miles*, 319 F. App'x 266, 272 (4th Cir. 2009) ("Even though there was limited evidence of Miles' drug sales, the district court correctly discerned from the facts that Miles

produced significantly more marijuana than he could have consumed."); *cf. United States v. Blais*, 141 F.3d 1152, *2 (2d Cir. 1998) (table op.) (concluding that an "affidavit plainly presented ample probable cause for the issuance of a warrant" to search a suspected marijuana trafficker's home where, in relevant part, it stated that "12 [marijuana] plants" would be "more than would be cultivated for personal consumption"); *United States v. Molina-Alfonso*, 377 F. App'x 850, 855 (11th Cir. 2010) (concluding that the evidence was sufficient to establish the defendant's guilt of narcotics conspiracy and possession where, in relevant part, 100 marijuana plants founds at property "was inconsistent with personal use"); *United States v. Eng*, 753 F.2d 683, 687 (8th Cir. 1985) (concluding that the evidence was sufficient to establish the defendant's guilt of narcotics conspiracy where, in relevant part, thirty-five marijuana plants, dried marijuana buds, and equipment used to harvest marijuana was "inconsistent with [the defendant's] personal use claim").

In sum, Mr. Hinkle did not "com[e] forward with evidence that he does not pose a danger to the community or a risk of flight," as he was required to do to carry his "limited burden of production." *Mercedes*, 254 F.3d at 436.  Accordingly, the Court should conclude Mr. Hinkle failed to rebut the statutory presumptions that favor his detention.

### B.   There is No Condition or Combination of Conditions That Can Reasonably Assure the Safety of the Community if Mr. Hinkle, a Violent Felon, is Released

Furthermore, the government can meet its burden of persuasion by clear and convincing evidence that Mr. Hinkle presents a danger to the community.  The evidence—when viewed through the prism of the 3142(g) factors and alongside the presumption—shows that there is no condition or combination of conditions that can reasonably assure the

safety of the community (or the defendant's appearance at trial) if Mr. Hinkle is released.

### 1. Nature and Circumstances of the Offenses Charged

Mr. Hinkle is charged with several serious firearm and drug offenses in the instant Complaint.   While the nature of these offenses themselves illustrate Mr. Hinkle's dangerousness, the circumstances of the investigation into Mr. Hinkle, as well as the execution of the federal search warrant of his residence, cast grave doubt as to the safety of any other person and the community if Mr. Hinkle is released.

### a.   Background to the Complaint

By way of background, the United States is investigating Mr. Hinkle in connection with the death of Crystal Quinn, a federal witness who was scheduled to testify in an upcoming criminal trial.   Indeed, Mr. Hinkle was one of the last people to interact with Ms. Quinn before Simon Gogolack, a defendant in a related prosecution, called 911 to report her death on August 1, 2023.   *See generally* Superseding Indictment, ECF No. 18, (dated Sept. 20, 2023), *United States v. Gogolack*, 1:23-CR-99 (W.D.N.Y).   The next day, during an interview with the FBI, Mr. Gogolack stated that, in the days immediately preceding her death, Mr. Hinkle told Ms. Quinn that there was money on her head.   Mr. Hinkle's apparent access to information about money being placed on Crystal Quinn's life further underscores his contacts in the criminal underworld.

In other words, there is evidence that Mr. Hinkle possessed knowledge of a murder-for-hire plot stemming from Ms. Quinn's cooperation with federal law enforcement and communicated as much to her shortly before she died.   Notably, Mr. Hinkle has, to date, never reported to law enforcement his knowledge of the murder-for-hire conspiracy.

**b.     The SWAT Team's Efforts to Clear the Hinkle Residence**

Mr. Hinkle's interactions with SWAT team members and, subsequently, law enforcement officers also evidence his dangerousness.   At approximately 6:00 a.m. on October 24, 2023, an FBI SWAT team attempted to "clear" Mr. Hinkle's residence at 4290 Donovan Road in Alma, New York.   The FBI engaged its SWAT team after concluding that Mr. Hinkle, who is known to harbor anti-government sentiments, would likely be armed and dangerousness.   Though the SWAT team announced that the FBI used flash grenades to effectuate a knock, and informed the occupants that they were executing a federal warrant over a loud megaphone, it took Mr. Hinkle several minutes to exit the residence.   One SWAT team member, who estimated that he had performed between 50 and 100 warrant operations for the SWAT team, advised that the lengthy period in between SWAT's initial announcement and Mr. Hinkle's exit gave him concern that Mr. Hinkle was preparing for armed confrontation with the FBI.

That concern was supported by Mr. Hinkle's subsequent behavior.   Specifically, when Mr. Hinkle finally opened the front door of the residence, he failed to exit and comply with the SWAT team's warnings.   In fact, Mr. Hinkle was holding something that he initially refused to drop and made furtive movements to the side of his body.   Eventually, Mr. Hinkle went so far as to attempt to re-enter the residence near the front door, prompting the SWAT team to escalate its demands, which ultimately resulted in Mr. Hinkle's surrender.

Notably, when FBI agents apprehended Mr. Hinkle, they found his cell phone on his person.   And when law enforcement seized Mr. Hinkle's phone, Mr. Hinkle responded

angrily and belligerently.[4]   Later, as pictured below when SWAT cleared the residence, they discovered a loaded rifle with a scope by the front door—just feet away from Mr. Hinkle when he appears to have attempted to re-enter the residence.  Upon discovering that loaded rifle, a SWAT team member stated that, in his view, Mr. Hinkle's behavior during the clearance process was consistent with that of someone contemplating an armed confrontation with the FBI.



**Rifle with Scope by front door of residence**

---

[4]      Mr. Hinkle continued to direct anger toward law enforcement during the initial hours of his detention, and, in one instance, asked a young, female law enforcement offer to hold his penis to help him urinate.

### c.    The Factual Basis of the Offenses Charged in the Complaint

One-hundred-and-thirty-four marijuana plants, nineteen firearms, numerous rounds of ammunition, and other evidence consistent with a large-scale drug-production operation: that is what FBI agents discovered in plain view in Mr. Hinkle's residence on October 24, 2023, when executing a federal search warrant.  As pictured below, many of those firearms were strategically located both at points of ingress and egress and in close proximity to Mr. Hinkle's grow-operation.





Marijuana plant

Firearms

Storage bin containing jars of marijuana

Digital scale

Later, when clearing the basement of 4290 Donovan Road, FBI agents observed—also in plain view—ammunition, marijuana, grow lights, other equipment used to sustain a large-scale grow operation in the basement of the residence.  Those materials are pictured as follows:



Ammunition



As these photos illustrate, Mr. Hinkle was armed and ready for a conflict in the event anyone threatened his drug distribution operation. In that regard—and bracketing for a moment that Mr. Hinkle, a felon, could not lawfully possess any of the 19 firearms found in his home—the strategic placement of loaded firearms near points of ingress and egress of his home, by windows, and next to drugs afforded Mr. Hinkle an "advantage relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62—63 (2d Cir. 2006). In other words, it is clear from the placement of the firearms literally in between a drug scale, a storage bin full of marijuana, and overlooking multiple marijuana plants, that Mr. Hinkle used weapons "to protect drugs, drug proceeds, or . . . himself" as he engaged in drug-related activities. *Id.*

## 2. Weight of the Evidence

Though the defense all but conceded that Mr. Hinkle unlawfully possessed firearms because he is a felon, it dismissed the strength of the government's case with regards to the narcotics distribution and unlawful possession of a firearm charges. Once more, this factor supports the government's argument for detention.

First, for the reasons explained, *supra*, the evidence is more than that sufficient to convict Mr. Hinkle of the charges under Title 21. Over 130 marijuana plants, many of which were labeled by strain (likely to ensure accurate marketing), were recovered from his property. Mr. Hinkle dried the marijuana in a trailer, stored a bin full of marijuana in his residence, had cameras installed on the exterior of his property to ensure adequate surveillance of his crop, and repurposed his basement to grow marijuana. In addition to these facts, the FBI found bags and bins containing suspected marijuana in the basement

and on the floors, and multiple scales.  As the Second Circuit has observed, "[p]ossession of equipment to weigh, cut and package drugs is highly probative of a purpose to distribute," as is Mr. Hinkle's "possession of . . . [multiple] loaded firearm[s]."  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

Second, the evidence is already sufficient to sustain a conviction under § 924(c).  As previously noted, the strategic placement of firearms by doors, entryways and exits, and near windows overlooking his crop supports the inference that Mr. Hinkle possessed firearms—some of which were loaded—in preparation for a drug-related conflict.  This evidence, by itself, is sufficient to sustain a conviction under § 924(c).  *See, e.g., United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001) (affirming conviction under § 924(c)(1) where unloaded shotgun was stored under pile of clothes in the room from which drugs were sold); *United States v. Wahl*, 290 F.3d 370, 376–77 (D.C. Cir. 2002) (affirming conviction under § 924(c)(1) where loaded gun was within defendant's reach and in close proximity to defendant's drug stash); *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005) (favorably citing *Wahl* and *Finley*).  Additionally, several of the firearms had tactical features, like lasers and scopes, which further evidences their strategic use in facilitating Mr. Hinkle's grow operation.

Third, and finally, there is no doubt that Mr. Hinkle unlawfully possessed firearms.  Mr. Hinkle all but conceded as much during the October 26th detention hearing.  But, if there was any doubt, FBI seized the following firearms from Mr. Hinkle's residence:

1.  Savage Arms Model 93 with a scope (behind the front door);

2.  Remington Arms rifle (also behind the front door);

3.  Knight muzzleloader model 5;

4.  Rugger 22 caliber LR with one live round of ammunition (behind a door);

5.  Remington Arms Rifle with a scope;

6.  Remington Arms rifle with 11 rounds of ammunition;

7.  Unknown make shotgun (next to a hutch);

8.  J Stevens Arms shotgun;

9.  Ithaca Gun Company rifle;

10. Remington Arms shotgun;

11. Crescent firearm gun of unknown model;

12. Remington Arms shotgun (20-gauge);

13. Olympia optimal rifle;

14. New England Firearms rifle (with scope);

15. Massberg shotgun;

16. Remington Arms shotgun (20-gauge);

17. S.P.A. Luige Franchi Brescia shotgun (12-gauge);

18. Unknown revolver; and

19. Remington Arms shotgun (12-gauge)

These firearms—some of which were loaded—as well as ammunition were found in virtually every room and corner of the residence, and plainly show that Mr. Hinkle violated 18 U.S.C. § 922(g)(1).

### 3.  History and Characteristics of the Defendant

The third factor similarly weighs against the defendant's release from custody.  For starters, Mr. Hinkle's scant employment history lends further support to the government's

position that he distributes marijuana.   And his criminal history demonstrates his dangerousness, dishonesty, and repeated unwillingness to comply with conditions of pretrial or post-conviction release.   In short, the evidence as to this factor clearly and convincingly shows that no condition or combination of conditions can reasonably assure the safety of the community if Mr. Hinkle is release.

### a.   Defendant's Employment History

As noted above, the defendant has limited employment history.  Mr. Hinkle told Pretrial Services that he has been "self-employed since 2020, as a contractor" and reports a monthly cash flow of $215.00.  While the government does not contest that Mr. Hinkle may perform odd jobs from time to time, the significant quantity of valuable drugs recovered from Mr. Hinkle's property indicates that he underreported his income to Pretrial Services. In that regard, Mr. Hinkle's "lack of candor to pretrial services, and by extension to the Court, are troubling and raise issues about supervision where [he] is being deceptive." *United States v. Mitchell*, No. 1:23-MJ-157 (RDA), 2023 WL 5438156, at *5 (E.D. Va. Aug. 23, 2023).

### b.   Criminal History

Mr. Hinkle also has an extensive criminal history—and repeated violations of the terms of his bail and probation.  On October 19, 2007, Mr. Hinkle pleaded guilty to resisting arrest and attempted assault in the Second Degree, a Class E felony.  He was sentenced to 6 months in jail and 5 years' probation, which he appears to have violated in both July and August 2009.

But Mr. Hinkle's criminal history both pre-and-post-dates his violent felony

19

conviction.  On March 3, 1995, Mr. Hinkle was charged with sexual misconduct for having intercourse with a female without her consent.  While out on bail for that offense, he was arrested again for criminal mischief.  Mr. Hinkle received a youthful offender adjudication on October 10, 1995, for the sexual misconduct charge, and was sentenced to a 3-year term of probation and 100 hours of community service.  Just three days later, on October 13, 1995, Mr. Hinkle was arrested for burglary in the third degree, a Class D felony, though he ultimately pleaded guilty to misdemeanor larceny on January 26, 1996.

Mr. Hinkle's criminal activity continued into his twenties.  On July 11, 1998, he was arrested for possession of stolen property, an offense to which he pleaded guilty on March 7, 2001.  Also in July of 1998, Mr. Hinkle was arrested for retail theft and sentenced for that offense to a 1-year term of probation on December 10, 1998.  The next month, Mr. Hinkle was arrested for driving while intoxicated.

Mr. Hinkle went without an arrest for seven years when, in August 2005, he committed the felony assault previously discussed.  A little over one year later, on December 22, 2006, Mr. Hinkle was arrested again, this time for assault in the third degree, criminal trespass in the second degree, and violent disorderly conduct.  That arrest occurred while Mr. Hinkle was out on bail for his felony assault charge.  Several months later, on April 22, 2008, Mr. Hinkle was arrested for criminal possession of a weapon in the fourth degree, also while he was on probation.  By then, Mr. Hinkle was in his thirties, and his criminal conduct only continued.  In May 2008, Mr. Hinkle, while still on probation, was arrested for perjury in the first degree, a Class D felony.  That same month, he was arrested with welfare fraud in the third degree, a Class D felony and offering a false instrument to file, a Class E felony.  Ultimately, Mr. Hinkle pleaded guilty to welfare fraud in the fifth

degree, a misdemeanor.

Moreover, though Mr. Hinkle made much of the fifteen-year lapse in between his last arrest and the instant charges during the October 26th detention hearing, his arrest record as reflected in the Pretrial Services Report does not reflect the full extent of his recent criminal history.[5]

For example, on December 8, 2018, New York State Police responded to Hinkle's residence at 4290 Donovan Road after a caller reported that he had shot deer on the caller's private property from a moving vehicle.  The NYSP officer who investigated the caller's complaint observed the vehicle from which Mr. Hinkle allegedly shot the deer at Mr. Hinkle's property.  Mr. Hinkle denied shooting the deer.  Later, when the NYSP officer returned, he spoke with Mr. Hinkle's girlfriend and co-defendant, Dillon Anderson, who "attempted to lie and state[d] [that] the vehicle was currently in the State of West Virginia," when, in fact, it was "parked down a long dead end trail."  *See* Exhibit 1 (N.Y. St. Pol. Rept. (dated Dec. 8, 2018)).  When the officer "explained to Anderson [that] [he] had already observed the vehicle on her property, she explained she was *not going to rat anyone out*."  *Id.* at 5 (capitalization removed and emphasis added).

Next, on December 9, 2021, Ms. Anderson called 911 to report that Mr. Hinkle

---

[5]     Mr. Hinkle's recent criminal conduct—separate and apart from the instant charges—undercuts Judge Roemer's conclusion that the government "failed to show by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person in the community" because Mr. Hinkle's "latest offense occurred over — about 16 years ago."  Tran. Det. Hr'g at 29, *United States v. Hinkle*, 1:23-MJ-5219 (W.D.N.Y. Oct. 26, 2023).  To be sure, Judge Roemer could not consider these more recent incidents because the government did not have the attached police reports at its disposal.  The investigation into Mr. Hinkle—and other related matters—is proceeding rapidly, and the government continues to review evidence gleaned from the October 24th search as it is processed.

threatened to kill her and then himself.  She also reported that Mr. Hinkle left his residence

at 4290 Donovan Road, where the FBI conducted the search warrant, with a shotgun and a

.22 rifle.[6]  The NYSP report provides as follows:

> [Howard Hinkle] and [Anderson] got into a verbal argument earlier in
> the day. She stated that they had an argument over the brakes on her
> vehicle, which made H. HINKLE upset.  She stated H. HINKLE
> stated to her that he would blow his brains out in the house, so that she
> w[ould] have to witness it, and clean up the mess.  She stated
> H.HINKLE said that he would kill her, and then kill himself.  She
> stated she gave him his space to let him cool off.  She stated she then
> took a shower, and when she got out, he began arguing with her again
> because he got his truck stuck by the garage, and that she didn't help
> him with it.  She stated he again stated that he would put a gun to his
> mouth, and pull the trigger.  She stated later on H. HINKLE grabbed a
> bag full of clothes from his room, and stated he didn't want to stay at
> the house tonight.  H. HINKLE then stated to her that he had no
> purpose here, and felt that he was done. He also stated again to D.
> ANDERSON that he would shoot himself right in front of her in the
> kitchen. That is when D.ANDERSON called 911 for assistance, and
> H, HINKLE then grabbed a loaded .22 rifle that was by the door, and
> left the house in his white Chevrolet pick-up truck.

*See* Exhibit 2 at 3 (N.Y. St. Pol. Rept. (dated Dec. 9, 2021)).  While no arrest is filed, Mr.

Hinkle was placed in a mental health hold by police. Per the police report:

> HINKLE into custody for mental health evaluation . . . . [officers]
> transported H. HINKLE to Olean General Hospital for further
> evaluation. While en route as well as waiting in the hospital waiting
> room, H.HINKLE stated again that while having an argument with
> his fiance D. ANDERSON, he stated that he would, "blow his brains
> out in front of her, so that she would have to clean it up."

*Id.*

More recent still, Mr. Hinkle was the subject of a domestic incident police report

---

[6]        The FBI recovered multiple shotguns and .22 rifles in searching Mr. Hinkle's
home.

earlier this year, in February 2023. According to the February 11th 911 call report, Mr. Hinkle was "punching walls and acting in an aggressive nature" at his sister's house.[7] *See* Exhibit 3 at 1 (Allegany Cnty. Off. Of Sheriff, Call for Service Detail Report (dated Feb. 11, 2023)).

Lastly, Pennsylvania State Police cited Mr. Hinkle on July 5, 2023, for shoplifting $104 worth of property from a Kwik Fill. Charges were filed in Pennsylvania state court and Mr. Hinkle pleaded guilty to the shoplifting offense on August 9, 2023. *See* Exhibit 4, Pennsylvania State Police Report (printed Oct. 27, 2023). Notably, Mr. Hinkle did not report this offense to the U.S. Probation Office, which raises serious concerns as to his ability to comply with the terms of his supervised release.

In short, Mr. Hinkle's "criminal history"—which reaches through three decades of his life—"is significant with repeated violations of probation or pretrial supervision." *United States v. Arrington*, ---F.Supp.3d----, 2023 WL 2492980, at *7 (W.D.N.Y. 2023) (Wolford, CJ.); *see generally United States v. Barnett*, No. 5:03-CR-243(NAM), 2003 WL 22143710, at *5 (N.D.N.Y. Sept. 17, 2003) (ordering detention for defendants with multiple violations of the terms of their pretrial detention and probation). Accordingly, this factor also weighs in favor of detention.

c.    **Ties to the Community**

The defendant's primary argument during the October 26th detention hearing related to his ties to the Western District of New York community. The government does not

---

[7]    A third 911 call was made on Mr. Hinkle in July of 2023. However, the 911 report offers little detail as to the call's purpose, noting only that the call was meant to "assist" with Mr. Hinkle.

contest that Mr. Hinkle has family in Western New York.  However, in addition to family and in light of Mr. Hinkle's large-scale drug operation, it is very likely that Mr. Hinkle's ties to the community include drug associates and individuals who unlawfully sale firearms. Indeed, in the days immediately preceding Ms. Quinn's death, Mr. Hinkle associated with Mr. Gogolack, an illegal drug dealer.  Accordingly, far from benefitting Mr. Hinkle, this factor under § 3142(g) is, at best, neutral and, at worst, weighs in favor of detention.

**4.    Nature and Seriousness of the Danger to Any Person or the Community**

The government addressed the defendant's danger to the community *supra*. However, it is worth emphasizing that this danger is not merely to the community as a whole, but also the danger that would be posed by the defendant's release to *any person* in the community.  Mr. Hinkle's knowledge of money being placed on Ms. Quinn's head is strongly suggestive of a murder-for-hire plot against Crystal Quinn, a federal witness in an *upcoming* trial with hundreds of other witnesses, underscores that there could be several individuals whose lives would be in very real danger should the defendant be released.  The defendant's apparent access to information about money being placed on Crystal Quinn's life further underscores the defendant's contacts in the criminal underworld, and this factor continues to weigh in favor of the existing presumption.  This factor continues to weigh in favor of the existing presumption.

**C.    Mr. Hinkle is a Flight Risk**

Finally, Mr. Hinkle, a recidivist offender, is a flight-risk: he faces, at minimum, a ten-year term of incarceration and the possibility of life because well over one hundred marijuana plants were recovered from his residence and he strategically placed firearms

throughout his home to protect his large-scale grow operation. *See United States v. Vasconcellos*, 519 F.Supp.2d 311, 319 (N.D.N.Y. 2007) ("Given the severe sentence [the defendant] is confronting [(a mandatory minimum ten-year sentence and the possibility of life)] and his lack of assets, he is a flight risk. Just as importantly, his current drug trafficking behavior, including that associated with the ammunition and handguns, has been dangerous. There are no release conditions that would preclude his risk of danger and flight."); *see also United States v. Henderson*, 57 F. App'x 470, at *1 (2d Cir. 2003) (unpublished) (affirming district court's conclusion that "a defendant facing a ten-year mandatory minimum had not sufficiently rebutted th[e] statutory presumption of a flight risk and the government's proffer was compelling"). Accordingly, Mr. Hinkle is strongly incentivized to flee the Western District of New York, and this flight risk militates in favor of detention.

## CONCLUSION

Mr. Hinkle's release poses a serious risk of danger to the community and individuals within, and a serious risk of flight. No condition or combination of conditions can lessen this risk to a point where Mr. Hinkle's appearance, nor the safety of the community or other individuals, can be reasonably assured. For the reasons stated above, the government respectfully requests that the District Court revoke Magistrate Judge Roemer's October 26, 2023, decision and order the defendant be detained pending trial.

DATED: Buffalo, New York, October 27, 2023.

TRINI E. ROSS
United States Attorney


By:           s/JOSEPH M. TRIPI
              s/NICHOLAS T. COOPER
              s/CASEY L. CHALBECK
              Assistant United States Attorney
              United States Attorney's Office
              Western District of New York
              138 Delaware Avenue
              Buffalo, New York 14202
              716.843.5839
              Joseph.Tripi@usdoj.gov

Exhibit 1

| NY State Police Olean | Incident Report | December 08, 2018 |
|---|---|---|

**Agency POC Name:** NY State Police Olean

**Data Owner Organization:** NY State Police Olean
**Data Item Status:** Closed
**Record GUID:** be6c6a95-60a1-42d1-a27c-d7d63ffa4ce5

**Agency POC Phone:** 518-786-2100

**Data Owner ORI:** NY1040100
**Data Item Date:** December 08, 2018

**Agency POC Email:**
nysic.nysic_po nyspdivhq@troopers.ny.gov
**Data Item Category:** Incident Report
**Data Item Reference ID:** Id_38116239

## People (8)

| Stephanie Grimaldi | Enforcement Official | DOB: Not Reported |
|---|---|---|

**Born:** Not Reported

Identifiers

Badge Number
officer badge number
5567

Associated Activities

Incident Repor ing
Official
Incident

| Dennis Nolder | Enforcement Official | DOB: Not Reported |
|---|---|---|

**Born:** Not Reported

Identifiers

Badge Number
officer badge number
5465

---

**Ages:** 50
**Gender:** Male
**Race:** White

Locations

Associated Activities

Activity Involved Person
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic

---

**Ages:** 51
**Gender:** Male
**Race:** White

Locations

Associated Activities

Activity Involved Person
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic

## Howard L Hinkle

**Born:** 12:07 PM July 22,

**Ages:** 42
**Height:** 68 in
**Weight:** 180 lb
**Hair Color:** Brown
**Eye Color:** Green
**Gender:** Male
**Race:** White

Identifiers

Locations

General
4290 Donovan Road
New York

Associated Activities

Activity Involved Person
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic
**Religion:** Unknown

Appearance Data
**Person Build:** Medium Build
**Eyeware:** No Eyewear
**Facial Hair:** Mustache
**Skin Tone:** medium skin

Aliases
String

---

Ages:
**Gender:** Male
**Race:** White

Locations

Associated Activities

Activity Involved Person
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic

---

## Dillon S Anderson

**Ages:** 40
**Gender:** Female
**Race:** White

Locations

Associated Activities

Activity Involved Person
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic

---

**Gender:** Female
**Race:** White

Locations

Associated Activities

Activity Involved Person
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic

---

## Activities (3)

## Offense

**Activity ID: Id_12390589**

Offense Data
Statute
  Id: 5102
  Jurisdiction: NY
Bias Motivation: Nonbias Or Nonhate Crime
Offense Code: Conserva ion
Domestic Violence Indicator: Nondomestic
Violence

## Incident

**Activity ID:** Id_38116239
**Start Date:** 5:12 AM December 08, 2018
**End Date:** 5:12 AM December 08, 2018

Associated Persons

Activity Involved Person

███████████

Howard L Hinkle

███████████

Locations

███████████

Activity Description

**Description:** CLOSING: On December 13, 2018 I
responded to 4290 Donovan Road, Wellsville to
interview HINKLE. Upon arrival, I interviewed HINKLE
who stated on December 8, 2018 he was operating the
2005 Chevrolet Silverado with his friend, ███████
███ on ███████████ HINKLE stated
he was in the area coming from a pond where he was
going to go ice fishing. HINKLE verified the
confrontation between himself and █████. HINKLE
denied shooting the deer on KNOX'S property. HINKLE
stated he is provided four tags per year and does not
need any further deer at this time. HINKLE stated if he
was going to shoot a deer from a moving vehicle he
would ensure that he retrieved the deer and did not
leave it. HINKLE stated while he was in the area he
never had a gun in his vehicle in order to hunt. When I
inquired to HINKLE why his vehicle appeared to have
been hidden on their property he replied  hat he had
just returned home from West Virginia and simply
wanted to surprise ANDERSON that he was home.
HINKLE stated he had no issue speaking with  he New
York State Police because he did not believe he did
anything wrong and was simply at the wrong place and
he wrong time. I interviewed ███████ who verified the
same facts provided by HINKLE. Complainant, ██████
advised of the same. I informed █████ if any fur her
information arises to incriminate the above mentioned
parties or  he person(s) responsible for the incident the
case could be re-addressed at a later time. CASE
CLOSED . FOLLOW UP: I responded to 4290 Donovan
Road, Wellsville in attempts to re-interview ANDERSON.
No one appeared to be home at the residence.
Message left for call back. I completed an SJS search
which revealed ANDERSON has  ies wi h HOWARD L.
HINKLE JR. I interviewed neighbor, ███████████
V███████████ stated he knows ANDERSON but
does not know her well. ███████ advised ANDERSON
has several vehicles but is unaware of who she may be
let ing operate the vehicles. While at █████  I
attempted to contact ANDERSON telephonically. Voice
mail left for call back. I attempted to contact HINKLE.
HINKLE stated he would be able to discuss the incident
on December 13, 2018 at approximately 12 00 PM.
During  he phone conversation HINKLE verified he
drives a white truck. Pending, INITIAL: Per Allegany
County Dispatch, I responded to County Road 29,
Willing for a report of an ENCON violation. Upon arrival,
I interviewed complainant, ███████████ in
regards to a deer being shot on his property from a
running motor vehicle. ███████ advised this evening,
December 8, 2018 at approximately 4:40 PM he was
outside his residence located at █████████████
Willing when he heard a gun shot which he believed to
happen directly behind his residence █████ and his
girlfriend, ███████████ responded to
███████ n which they believed the sound to
come from. Upon their arrival, they observed a 2005
Chevrolet Silverado bearing New York registration
███████ with two unidentified, middle aged, males in
 he vehicle. ███████ stated the vehicle pulled around and
parked on the south shoulder of the roadway. █████
stated he pulled up along side the vehicle and asked
both males if they had gotten any  hing. Both men
appeared to have been confused by the question.
███████ explained to both men,  hat while at his
residence he had heard a gun shot, assuming someone
had shot a deer. Both men denied shooting any guns.
Bo h men re-entered the vehicle and left the scene.
█████ stated he followed the vehicle in an attempt to
obtain the registration. ███████ advised when he was
finally able to obtain the registra ion he went back to
where the vehicle was stopped. Approximately twenty-
five feet away from the shoulder of the roadway was a
small doe. █████ stated at this time he contacted the
New York State Police. ███████ stated the property in
which the deer was killed is their private property. Signs
posted indicated the same. Gen1 4 provided by ██████

stated  he above men ioned details and is attached as
Enclosure #1. Deer located approximately twenty-five
feet away from the roadway, adjacent to where the truck
was parked on the shoulder of the roadway. Deer had
one apparent gun shot wound which resulted in it's
death. Allegany County ENCON officers unavailable.
Due to the fact ENCON was not available ███ was
provided a Deer Possession Tag #A298625. I advised
███ o contact the New York State Police immediately
if the person(s) responsible returns to  he scene in an
attempt to obtain the deer. I responded to 4290
Donovan Road, Wellsville in attempts to interview the
owner of the vehicle. Upon my arrival, I observed the
2005 Chevrolet Silverado bearing New York registration
27734MK parked down a long dead end trail. It
appeared the owner was attempting to hide  he vehicle.
I interviewed owner, DILLON S. ANDERSON who
refused to state who she loaned the vehicle to this
evening. ANDERSON attempted to lie and state  he
vehicle was currently in the State of West Virginia. Once
I explained to ANDERSON I had already observed the
vehicle on her property she began to explain she was
not going to rat anyone out. ANDERSON requested the
New York State to follow up with her on November 12,
2018.

## Service Call

**Activity ID:** Id_38116557

## Locations (7)

| | Associated People |
|---|---|
| ███ | ███ |
| ███ | |
| ███ | Associated People / General Association |
| 4290 Donovan Road New York | Associated People / General Association / Howard L Hinkle |
| ███ | Associated People / General Association |
| ███ | Associated People / General Association |
| 4290 Donovan Road New York | Associated People / General Association / Dillon S Anderson |

## Items (1)

### Chevrolet Silverado

**Color:** White
**License Plate:** New York 27734MK
**VIN:** 1GCHK29U65E216931

back to top

close print view

N-DEx information may be viewed, output, or discussed without advance authorization of the record owning agency. However, any use of N-DEx information requires the satisfaction of the Advanced Permission Requirement (confirming the terms of information use) and the Verification Requirement (verifying the completeness, timeliness, accuracy, and relevancy).

Samantha Lamantia                    UNETSHLAMANTIA@FBI.GOV

# Exhibit 2
US FBI Field Offc Buffalo NY

| NY State Police Olean | Incident Report | December 09, 2021 |
|---|---|---|

**Agency POC Name:** NY State Police Olean

**Data Owner Organization:** NY State Police Olean
**Data Item Status:** Cleared by Arrest
**Record GUID:** 1eca9d38-a4a9-4169-905f-55a07c2a5555

**Agency POC Phone:** 518-786-2100

**Data Owner ORI:** NY1040100
**Data Item Date:** December 09, 2021

**Agency POC Email:**
nysic.nysic_po.nyspdivhq@troopers.ny.gov
**Data Item Category:** Incident Report
**Data Item Reference ID:** Id_53450620

## People (4)

| Dillon S Anderson | Victim | |
|---|---|---|



**Born:** 12:10 PM
**Ages:** 43
**Height:** 63 in
**Weight:** 165 lb
**Hair Color:** Brown
**Eye Color:** Brown
**Gender:** Female
**Race:** White

Identifiers

Social Security #

Locations

General
4290 Donovan Road
New York

Associated Persons

Subject Victim
Howard L Hinkle

Associated Activities

Activity Involved Person
Incident

Incident Victim
Incident

Other Data

Biographic Data
**Ethnicity:** Nonhispanic
**Religion:** Unknown

Appearance Data
**Person Build:** Medium Build
**Eyeware:** No Eyewear
**Facial Hair:** Clean Shaven
**Skin Tone:** medium skin

| Jason Schmand | Enforcement Official | DOB: Not Reported |
|---|---|---|



**Born:** Not Reported

Identifiers

Badge Number
officer badge number
2882

| Tyler Stevens | Enforcement Official | DOB: Not Reported |
|---|---|---|

**Born:** Not Reported

Identifiers

Badge Number
officer badge number
712

Associated Activities

Incident Reporting
Official
Incident

Exhibit 3

| **Howard L Hinkle** | | **DOB: 12:07 PM July 22, 1976** |
|---|---|---|



**Born:** 12:07 PM July 22,

**Ages:** 45
**Height:** 68 in
**Weight:** 180 lb
**Hair Color:** Brown
**Eye Color:** Green
**Gender:** Male
**Race:** White

Identifiers

Social Security #

Locations

General
4290 Donovan Road
New York

Associated Persons

Subject Victim
Dillon S Anderson

Other Data

Biographic Data
**Ethnicity:** Nonhispanic
**Religion:** Unknown

Appearance Data
**Person Build:** Medium Build
**Eyeware:** No Eyewear
**Facial Hair:** Mustache
**Skin Tone:** medium skin

Aliases
String

## Activities (4)

### Offense

**Activity ID:** Id_20478543

Offense Data
**Statute**
  **Id:** 5527
  **Jurisdiction:** NY
**Bias Motivation:** Nonbias Or Nonhate Crime
**Offense Code:** Crimes Against Person
**Domestic Violence Indicator:** Domes ic Violence

## Incident

**Activity ID:** Id_53450620
**Date:** 6:12 AM December 09, 2021

Associated Persons

Activity Involved Person | Incident Victim
Dillon S Anderson | Dillon S Anderson

Locations

Incident
4290 Donovan Road
Alma, New York

Activity Description

**Description:** Initial Entry On December 9, 2021 Troopers responded to 4290 Donovan Road, T/Alma for a domestic dispute through Allegany County 911. Tpr Papponetti and Hoak interviewed the victim, DILLON ANDERSON, who stated that her fiance, HOWARD HINKLE and her got into a verbal argument earlier in  he day. She stated  hat they had an argument over the brakes on her vehicle, which made H. HINKLE upset. She stated H. HINKLE stated to her that he would blow his brains out in  he house, so that she was have to witness it, and clean up  he mess. She stated H. HINKLE said that he would kill her, and then kill himself. She stated she gave him his space to let H. HINKLE cool off. She stated she then took a shower, and when she got out, he began arguing with her again because he got his truck stuck by the garage, and that she didn't help him with it. She stated he again stated  hat he would put a gun to his mouth, and pull the trigger. She stated later on H. HINKLE grabbed a bag full of clothes from his room, and stated he didn't want to stay at the house tonight. H. HINKLE then stated to her that he had no purpose here, and felt that he was done. He also stated again to D. ANDERSON that he would shoot himself right in front of her in  he kitchen. That is when D. ANDERSON called 911 for assistance, and H, HINKLE then grabbed a loaded .22 rifle that was by the door, and left the house in his white Chevrolet pick-up truck. D. ANDERSON stated that she would not like to pursue charges, but that H. HINKLE needs help for his mental health. Tpr Papponetti obatined a deposition stating same. Patrols BOLO'ed for H. HINKLE and said vehicle, which was located at 1614 Fanton Road, T▋ ▋▋▋▋▋▋▋▋▋▋▋ Informa ion TOT'ed to myself. ITC , Closing Entry Tpr Phelps and I were advised that patrols were out with HOWARD HINKLE at 1614 Fanton Road, T/Wellsville. We responded to same address to assist, and place H. HINKLE into custody for mental health evaluation 9.41. Tpr Phelps and I transported H. HINKLE to Olean General Hospital for further evalua ion. While en route, as well as waiting in the hospital waiting room, H. HINKLE stated again that while having an argument with his fiance D. ANDERSON, he stated that he would, "blow his brains out in front of her, so that she would have to clean it up." H. HINKLE was TOT'ed to to Olean General Hospital ▋▋▋▋▋▋▋▋ No further SP assistance required. DIR completed and submitted. CBA

## Service Call

**Activity ID:** Id_53452075

## Offense

**Activity ID:** Id_20478725

Offense Data
**Statute**
**Id:** 6892
**Jurisdiction:** NY
**Bias Motivation:** Nonbias Or Nonhate Crime
**Offense Code:** Heal h Or Safety
**Domestic Violence Indicator:** Domes ic Violence

## Locations (3)

4290 Donovan Road
Alma, New York

4290 Donovan Road
New York

Associated People

General Association
Howard L Hinkle

4290 Donovan Road
New York

Associated People

General Association
Dillon S Anderson

back to top

close print view

N-DEx information may be viewed, output, or discussed without advance authorization of the record owning agency. However, any use of N-DEx information requires the satisfaction of the Advanced Permission Requirement (confirming the terms of information use) and the Verification Requirement (verifying the completeness, timeliness, accuracy, and relevancy).

| NY State Police Olean | Incident Report | February 11, 2023 |
|---|---|---|

**Agency POC Name:** NY State Police Olean

**Data Owner Organization:** NY State Police Olean
**Data Item Status:** Closed
**Record GUID:** 6db0f9a0-23fb-4e12-9ac8-e6ccf5e57681

**Agency POC Phone:** 518-786-2100

**Data Owner ORI:** NY1040100
**Data Item Date:** February 11, 2023

**Agency POC Email:**
nysic.nysic_po.nyspdivhq@troopers.ny.gov
**Data Item Category:** Incident Report
**Data Item Reference ID:** Id_59827756

## People (4)

|  | **Victim** | **DOB:** ▓▓▓▓▓ |
|---|---|---|

**Born:** 12:09 PM September
**Ages:** ▓
**Gender:** Female
**Race:** White

Locations
▓▓▓▓▓▓

Associated Persons
Subject Victim
Howard Hinkle

Associated Activities
Activity Involved Person | Incident Victim
Incident | Incident

Other Data
Biographic Data
**Ethnicity:** Nonhispanic

| **Daniel Armenia** | **Enforcement Official** | **DOB: Not Reported** |
|---|---|---|

**Born:** Not Reported

Identifiers
Badge Number
officer badge number
239

Associated Activities
Incident Reporing
Official
Incident

| **Kevin Gabel** | **Enforcement Official** | **DOB: Not Reported** |
|---|---|---|

**Born:** Not Reported

Identifiers
Badge Number
officer badge number
4003

| **Howard Hinkle** | | **DOB: 12:07 PM July 22,** ▓▓▓ |
|---|---|---|

**Born:** 12:07 PM July 22,
▓▓▓
**Ages:** 46
**Gender:** Male
**Race:** White

Locations
General
4290 Donovan Rd New
York

Associated Persons
▓▓▓▓▓▓

Other Data
Biographic Data
**Ethnicity:** Nonhispanic

## Activities (2)



## Incident

**Activity ID:** Id_59827756
**Date:** 2 02 AM February 11, 2023

Associated Persons

Locations

Activity Description

**Description:** Attempted to speak with Hinkle via phone having negative results. ITC, CLOSING: I interviewed Howard Hinkle who stated that he and his step sister ▓▓▓▓ had a misunderstanding over he house hat she is living in. Hinkle stated that he just left after his to deter any other problem. CLOSED, INITIAL: CAD # 23001814 Dispatched by Allegany County to patrol to ▓▓▓▓▓▓ for a Domestic Dispute. I arrived on scene and spoke wi h ▓▓▓ ▓▓▓▓ who stated that her ▓ ▓▓▓ Howard Hinkle was here and had been mean to her before leaving he residence. ▓▓▓ stated hat she was fine and that she did not wish to do any paperwork nor want anything else due to nothing happening. No other SP assistance needed. DIR was completed on scene and given to ▓▓ -PENDING

## Service Call

**Activity ID:** Id_59829517

## Locations (3)

| | Associated People |
|---|---|

| 4290 Donovan Rd New York | Associated People |
|---|---|
| | General Association Howard Hinkle |

back to top

close print view

N-DEx information may be viewed, output, or discussed without advance authorization of the record owning agency. However, any use of N-DEx information requires the satisfaction of the Advanced Permission Requirement (confirming the terms of information use) and the Verification Requirement (verifying the completeness, timeliness, accuracy, and relevancy).



# PENNSYLVANIA STATE POLICE

**General Offense Report**

**GO# PA 2023-896117** | **Operational Status: PENDING COURT**

This is a Pennsylvania State Police Department confidential document. Release of any information contained within this document without the consent of the issuing agency is unlawful dissemination and will be considered a criminal act punishable by law.

Exhibit 4



# PENNSYLVANIA STATE POLICE
## GO# PA 2023-896117

**THEFT RETAIL/SHOPLIFTING**
**ARRESTEE (includes runaway)**
**# 1 - HINKLE, HOWARD L JR**
**Non-Traffic Citation Number  N0152267-3**

# Table of Contents

**Related Person(s)** ............................................................................................................ 1

    1. ARRESTEE (includes runaway) # 1 - HINKLE, HOWARD L JR ...................................... 1

    2. VEH OWNER # 1 - ANDERSON, DILLON S ...................................................................... 3

    3. OTHER # 1 - ███████████ ............................................................................................ 4

**Related Business(es)** .................................................................................................... 5

    1. Victim # 1 - KWIK FILL .................................................................................................. 5

**Related Vehicle(s)** ......................................................................................................... 6

    1. Involved # 1 - 27734MK, NY VIN# 1GCHK29U65E216931 ......................................... 6

**Related Narrative(s)** ...................................................................................................... 7

    1. 1 -INITIAL NARRATIVE 07/05/2023 .............................................................................. 7

    2. 2 - NEWS RELEASE NARRATIVE 07/05/2023 ........................................................... 9

**Related Follow Up(s)** ..................................................................................................... 10

    1. Follow Up Report # PA 1 ............................................................................................... 10

        1. VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT - ............................................ 10

        2. OTHER - ............................................................................................................... 12

        3. PROPERTY RECORD - F02-6982 ......................................................................... 13

    2. Follow Up Report # PA 2 - PORT,B,15298 .................................................................. 14

        3 - OFFICER NARRATIVE 09/23/2023 .................................................................... 14

        7-TEXT TEMPLATES - NON TRAFFIC CITATION DISPOSITION ........................ 15

    3. Follow Up Report # PA 3 - TRICK,M,13606 ................................................................ 16

        3 - OFFICER NARRATIVE - VIDEO FILED 08/28/2023 .......................................... 16

**Related Property Report(s)** ........................................................................................... 17

    1. PROPERTY REPORT #  23896117  (STOLEN) ......................................................... 17



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT | |
|---|---|---|
| **Reported Date:** Jul-05-2023 (Wed.) | **Officer:** 799829 - PORT,B,15298 | **Approved by:** 610506 - DELP,M,10061 |

| Date Occurred: Jul-05-2023 (Wed.) | | Time: 1439 | Latest Possible Date: | | Time: |
|---|---|---|---|---|---|

**Location of Occurrence:** 108 N GENESEE ST , GENESEE TWP (POTTER)   **District:** F02   **Zone:** F0233   **Grid:**

| Study: Not Applicable | Domestic Violence: No |
|---|---|

**Offense: #1**   THEFT RETAIL/SHOPLIFTING - COMPLETED

| Total Stolen: $104 | Total Damaged: | Total Recovered: |
|---|---|---|

## Clearance Information

| Agency: PA State Police | Date Cleared: 07/27/2023 | Cleared by: PORT,B,15298 |
|---|---|---|

| Status: Cleared By Arrest Or Citation | IBR Cleared exceptionally status: Not Applicable |
|---|---|

## Related Person(s)

### ARRESTEE (includes runaway) # 1 - HINKLE, HOWARD L JR

| Sex: Male | Race: WHITE | Ethnicity: Non-Hispanic | DOB: ▓▓▓▓ |
|---|---|---|---|

**Age Based Off Incident Occurrence Date:** 46

| Height: 5'08   Weight: | Hair: | | Eyes: GREEN |
|---|---|---|---|

**Address:** 4290 DONOVAN RD WELLSVILLE, NY 14895

| Home #: ▓▓▓▓ | Work #: | Cell #: ▓▓▓▓ |
|---|---|---|

**Email Address:**

| Place of Birth: | Citizenship: | |
|---|---|---|
| Language: | Marital Status: | Occupation: |
| Employer: UNKNOWN | Employer Address: | |
| Driver's License #: ▓▓▓▓ New York | Social Security #: | |
| Complexion: | Build: | Handed: |

**Description of Facial Hair:**

| Facial Hair Color: | Eye Glass Lens: |
|---|---|

## Linkage Factors

| Resident status: Nonresident | Age Range: 30-49 Years | Just. homicide circumstance: |
|---|---|---|

**Aggravated assault/homicide:**

| Related vehicle #: 1 - 27734MK, NY | Person seat position: |
|---|---|

**Type of injury:**

| Person location: | Arrest date: 07/27/2023 |
|---|---|

**Disposition:** Not Taken into Custody

| Juvenile Status: | Multiple Clearance: Not Applicable |
|---|---|

**Armed with:** Unarmed

**Arrest type:** Summoned/Cited(Not Taken Into Custody)

**Offense:** 2302 - 0  THEFT RETAIL/SHOPLIFTING  - COMPLETED

## Processed Details

| FINGERPRINTED | No |
|---|---|
| PHOTOGRAPHED | No |
| NON-TRAFFIC CITATION NUMBER | N0152267-3 |

## Refiled Charges



# PENNSYLVANIA STATE POLICE

**General Offense Report**

| GO# PA 2023-896117 | Operational Status: PENDING COURT |
| --- | --- |

**Limited English Proficiency**

| NON-PSP INTERPRETER | Shall be added as an Entity |
| --- | --- |



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT |
|---|---|

## VEH OWNER # 1 - ANDERSON, DILLON S

| Sex: Female | Race: WHITE | Ethnicity: Non-Hispanic | DOB: 1 ▓▓▓▓ |
|---|---|---|---|

| Age Based Off Incident Occurrence Date: 44 |
|---|

| Height: 5'03   Weight: | Hair: | Eyes: BROWN |
|---|---|---|

| Address: 4290 DONOVAN RD  WELLSVILLE, NY  14895 |
|---|

| Home #: | Work #: | Cell #: ▓▓▓▓ |
|---|---|---|

| Email Address: |
|---|

| Place of Birth: | Citizenship: |
|---|---|

| Language: | Marital Status: | Occupation: |
|---|---|---|

| Employer: | Employer Address: |
|---|---|

| Driver's License #: ▓▓▓▓  New York | Social Security #: |
|---|---|

| Complexion: | Build: | Handed: |
|---|---|---|

| Description of Facial Hair: |
|---|

| Facial Hair Color: | Eye Glass Lens: |
|---|---|

## Linkage Factors

| Resident status: Nonresident | Age Range: 30-49 Years | Just. homicide circumstance: |
|---|---|---|

| Aggravated assault/homicide: |
|---|

| Related vehicle #: | Person seat position: |
|---|---|

| Type of injury: |
|---|

| Person location: | Arrest date: |
|---|---|

| Disposition: |
|---|

| Juvenile Status: | Multiple Clearance: |
|---|---|

| Armed with: |
|---|

| Arrest type: |
|---|



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT |
|---|---|

| OTHER # 1 - ▮▮▮▮▮▮▮▮▮▮▮ | | | |
|---|---|---|---|
| Sex: Female | Race: WHITE | Ethnicity: Non-Hispanic | DOB: ▮▮▮▮▮ |

| Age Based Off Incident Occurrence Date: 50 |
|---|

| Height: 5'00   Weight: | Hair: | Eyes: BROWN |
|---|---|---|

| Address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
|---|

| Home #: | Work #: | Cell #: ▮▮▮▮▮▮▮ |
|---|---|---|

| Email Address: |
|---|

| Place of Birth: | Citizenship: AMERICAN |
|---|---|

| Language: English | Marital Status: | Occupation: |
|---|---|---|

| Employer: KWIK FILL | Employer Address: |
|---|---|

| Driver's License #: ▮▮▮▮▮▮▮▮▮ | Social Security #: |
|---|---|

| Complexion: | Build: | Handed: |
|---|---|---|

| Description of Facial Hair: |
|---|

| Facial Hair Color: | Eye Glass Lens: |
|---|---|

| Linkage Factors | | |
|---|---|---|
| Resident status: Resident | Age Range: 50-64 Years | Just. homicide circumstance: |

| Aggravated assault/homicide: |
|---|

| Related vehicle #: | Person seat position: |
|---|---|

| Type of injury: |
|---|

| Person location: | Arrest date: |
|---|---|

| Disposition: |
|---|

| Juvenile Status: | Multiple Clearance: |
|---|---|

| Armed with: |
|---|

| Arrest type: |
|---|



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT | |
|---|---|---|

**Related Business(es)**

**Victim # 1 - KWIK FILL**

| Address: 108 N GENESEE ST, GENESEE, PA  16923 | | |
|---|---|---|
| Phone #: ▮▮▮▮▮▮ | Type: Convenience Store | |
| Alarm Company: | Security: No | |
| Victim of Offense:  THEFT RETAIL/SHOPLIFTING -  COMPLETED | | |
| Contact: ▮▮▮▮▮▮▮▮ | Affiliation:  MANAGER | Phone #: ▮▮▮ ▮▮▮▮ |



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT |
|---|---|

## Related Vehicle(s)

### Involved #1 - 2005  CHEVROLET  SILVERADO

| License Plate: 27734MK | License State: New York | VIN#: 1GCHK29U65E216931 | OAN: |
|---|---|---|---|
| Style: PICKUP | | Color: White | |

| Miscellaneous Information: | |
|---|---|
| Type: AUTOMOBILE | Transmission: |
| Interior description: | Exterior features: |
| Modifications: | Condition: |
| Body damage: | Wheels: |
| Windows: | Features: |

## Linkage Factors

| Related Owner: | Contacted owner: N |
|---|---|

| Vehicle Use: DRIVEN BY SUSPECT/ARRESTEE TO SCENE, DRIVEN BY SUSPECT/ARRESTEE FROM SCENE | |
|---|---|

| # of Occupants: | Leased/Owned: | Location: GOA/NOT LOCATED | |
|---|---|---|---|
| Disposition: | | | Towed: No |
| Insurance Company: | | | Liability Insurance: No |
| Policy #: | | Expiry date: | |



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117** | **Operational Status: PENDING COURT**

**Related Document**

**Document:** 1 -INITIAL NARRATIVE
**Author:** 799829 - PORT,B,15298
**Related Date/Time:** Jul-05-2023 (Wed.) 1659
**Subject:**

DESCRIPTION OF THE SCENE / LOCATION:

The location of the crime is 108 North Genesee Street, Genesee Borough, Potter County, PA. It can be described as a brick gas station/convenience store, with rows of merchandise inside. The business name is Kwik Fill.

PHYSICAL EVIDENCE:

Physical evidence at the scene includes surveillance footage of the incident.

SYNOPSIS:

On 07/05/23, PSP Coudersport was contacted by ▮▮▮▮▮▮▮▮▮▮, who is the manager of the Kwik Fill, in regards to a previously occurred retail theft at the business. During inventory check of the store, a carton of Marlboro Red cigarettes was missing. Upon review of surveillance footage, the incident occurred on 07/03/23. The suspect was observed taking a carton of cigarettes off the counter that he had not paid for and then left the store.

INTERVIEW COMPLAINANT: (▮▮▮▮▮▮▮▮▮▮)

On 07/05/23 at approximately 1600 hours, ▮▮▮▮▮▮ was interviewed at the scene of the incident. ▮▮▮▮▮▮ related the following:

She is the manager of Kwik Fill. At the end of each shift, all of the cigarettes at the store must be accounted for. Upon inventory check, a carton of Marlboro Red cigarettes was missing. Upon review of the store's surveillance footage, an unknown white male was paying for his items at the register. When the cashier turned around, the individual had taken a carton of cigarettes and left the store. The cigarettes retail value is $103.99. The individual had paid cash for two drinks that he had purchased.

INVESTIGATIVE DETAILS:



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117**  **Operational Status: PENDING COURT**

Video footage was reviewed that showed the Arrestee taking a carton of cigarettes from the Kwik Fill without paying for them on 07/03/23 at approximately 1347 hours. The Arrestee left the scene in a white, Chevy Silverado, NY Registration 27734MK.

Through investigative sources, the Arrestee was identified as Howard HINKLE Jr.

On 07/05/23, a PA Crime Victim/Witness guide was issued to Kwik Fill (See PA Crime Victims Receipt).

On 07/25/23, video surveillance on the incident was received and was entered into evidence(Property Record - F026982).

On 07/27/23, HINKLE was cited with PA/CC 3929 (a)(1) Retail Theft, Citation # N0152267-3. Charges were filed through District Court 55-4-01.

ATTACHMENTS:

Victim Witness Guide Receipt- Kwik Fill

Receipt of Stolen Items from Kwik Fill

Property Record - F026982

CONCLUSIONS / RECOMMENDATIONS:

I recommend that this report remains open pending court.



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117**          **Operational Status: PENDING COURT**

## Related Document

**Document:** 2 - NEWS RELEASE NARRATIVE

**Author:** 799829 - PORT,B,15298

**Related Date/Time:** Jul-05-2023 (Wed.) 1659

**Subject:**

On 07/05/23, PSP Coudersport was dispatched to 108 North Genesee Street, Genesee Township, Potter County, for a Retail Theft. The Arrestee left the Kwik Fill without paying for a carton of Marlboro Red cigarettes valued at $103.99. The Arrestee was charged with PA/CC 3929 (a)(1), Retail Theft through District Court 55-4-01.



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT | |
|---|---|---|

## Follow Up Report #1

| | | Assigned on: Jul-27-2023  (Thu.) 833 |
|---|---|---|
| Completed: Yes | Approved on: 08/22/2023 | Approved by: DELP,M,10061 |

## Related Report Image(s)

| Type: Victim/Witness Assistance Guide Receipt |
|---|
| Description: |



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117**          **Operational Status: PENDING COURT**

 PENNSYLVANIA CRIME VICTIMS

Receipt of Information

I acknowledge receiving my basic rights as a crime victim
and information on related services available to me.

23 - 896117

INCIDENT NUMBER

(The completed and signed copy of this form
shall be retained by Law Enforcement.)



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117**    **Operational Status: PENDING COURT**

## Related Report Image(s)

**Type:** Other

**Description:**

```
              KWIK FILL #408
             108 N. GENESEE St
            GENESEE, PA 16923
               814-228-3403
    -----------------------------------
    020 CASHIER 10         Store: 0408
     *** Duplicate ***
    Register # 02.      Receipt#:74500
        MERCHANT COPY
       Wed Jul 05 2023 15:59:19
    -----------------------------------
    ID CHK TOBACCO-08-09-1960 SCANNED
    MARLBORO BOX        USD 10.06TX
    028200003577

    MARLBORO BOX        USD 9.56TX
    028200003577

    MARLBORO BOX        USD 10.06TX
    028200003577

    MARLBORO BOX        USD 9.56TX
    028200003577

    MARLBORO BOX        USD 10.06TX
    028200003577

    MARLBORO BOX        USD 9.56TX
    028200003577

    MARLBORO BOX        USD 10.06TX
    028200003577

    MARLBORO BOX        USD 9.56TX
    028200003577

    MARLBORO BOX        USD 10.06TX
    028200003577

    MARLBORO BOX        USD 9.56TX
    028200003577
    -----------------------------------
    Sale Total          USD 98.10
               6.00%  $5.886
    Tax Total           USD 5.89
    Total               USD 103.99
    Cash                USD 103.99
    -----------------------------------
          HOW ARE WE DOING?
          800-443-3523 X4834

       FOR QUESTIONS & COMMENTS
            PLEASE CALL
       1-800-443-3523 EXT 4834

            Items 10
```

**PENNSYLVANIA STATE POLICE**

GO# PA 2023-896117

Related Report Image(s)

Operational Status: PENDING COURT

General Offense Report

Type: Property Record

Description: F02-6982

---

SP 7 - 007

**PENNSYLVANIA STATE POLICE**
**PROPERTY RECORD**

| 4. STATUS | |
|---|---|
| [X] EVIDENCE  [ ] FOUND  [ ] RECOVERED  [ ] RECEIPT  [ ] OTHER | 5. OFFENSE: RETAIL THEFT |

| | 6. STATION/DISTRICT OFFICE |
|---|---|
| | COUDERSPORT/2420 |

| 7. SUBMITTING OFFICER | BADGE NO. | 8. RECEIVING OFFICER | BADGE NO. | 9. DATE | TIME |
|---|---|---|---|---|---|
| TPR BROCK W PORT | 15298 | TPR RICHARD T OBERMEYER | 14425 | 7/25/2023 | 0700 |

| 10. INVESTIGATING OFFICER | BADGE NO. | 11. SIGNATURE OF RECEIVING OFFICER |
|---|---|---|
| TPR BROCK W PORT | 15298 | |

| 12. FOUND OR RECOVERED FROM | ADDRESS | TELEPHONE NO. | LOCATION | 13. DATE | TIME |
|---|---|---|---|---|---|
| KWIK FILL | 108 NORTH GENESEE ST, GENESEE , PA 16923 | 814-228-3660 | GENESEE TOWNSHIP | 7/25/2023 | 0700 |

14. CODES

**STORAGE AREA**
1. PROPERTY ROOM
2. SAFETY DEPOSIT BOX
3. EXPLOSIVE MAGAZINE
4. NON - DEPARTMENT
5. IMPOUND LOT
6. OTHER DEPT, FACILITY
7. NOT APPLICABLE

**DISPOSITION**
1. DESTROYED
2. ESCHEATED
3. EXPENDED IN LABORATORY
4. RELEASED TO OWNER/FINDER
5. DONATED
6. FORFEITURE
7. OTHER
8. CONVERTED TO DEPT. USE
9. TRANSFERRED
10. FWD TO DHQ
11. FWD TO FSU

**REMOVAL CODE**
1. CUSTODY
2. COURT
3. LABORATORY
4. OTHER
5. ESCHEATABLE
6. COMPUTER CRIME OFFICE
7. FINAL DISPOSITION
8. INVESTIGATION
9. REPACKAGE
10. FSU

| 15. ITEMS - (ONE ITEM PER LINE) | 16.TYPE PROP | 17. CODE | 18. QTY | 19. VALUE | 20. STORAGE AREA CODE | 21. DISP. CODE |
|---|---|---|---|---|---|---|
| 1  SECURITY CAMERA VIDEO | 27 | 1 | 1 | | 1 | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |

| 22. PROPERTY | | 23. DATE & TIME | 24. ITEM NO.(S) | 25. OFFICER'S SIGNATURE/BADGE NO. | 26. CUSTODIAL OFFICER'S INIT/BADGE NO. | 27. REMOVAL CODE, LOCATION & REMARKS | 28. ESTIMATED DATE OF RETURN | 29. COMPUTER ENTRY |
|---|---|---|---|---|---|---|---|---|
| IN | OUT | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

30. I HEREBY CERTIFY THAT I AM THE OWNER OF PROPERTY OR AUTHORIZED AGENT TO RECEIVE ITEM(S) NO.

| 31.CLAIMANT'S NAME | OWNER'S NAME | ADDRESS | TELEPHONE NO. |
|---|---|---|---|
| 32. CLAIMANT'S SIGNATURE | OWNER'S SIGNATURE | | DATE |
| 33. PICS APPROVAL NO. | 34. INACTIVE  [ ] | | |

1. PROPERTY RECORD CONTINUATION

2. CAD/CASE NO.    PA 2023-896117

3. INVENTORY NO.    F02-6982



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117**                    **Operational Status: PENDING COURT**

**Follow Up Report #2**

| Assigned to: 799829 - PORT,B,15298 | | Assigned on: Aug-22-2023 (Tue.) 1313 |
|---|---|---|
| Completed: Yes | Approved on: 09/29/2023 | Approved by: DELP,M,10061 |

**Narrative Text #1**

**Document:** 3 - OFFICER NARRATIVE
**Related Date/Time:** Sep-23-2023 (Sat.) 1503

**Subject:**

Case Update:


On 08/09/23 HINKLE plead guilty to PA/CC 3929 (A)(1), Retail Theft.




Conclusions / Recommendations:


I recommend this report remains open pending processing of the defendant.



# PENNSYLVANIA STATE POLICE

### General Offense Report

**GO# PA 2023-896117**          **Operational Status: PENDING COURT**

**Narrative Text #2**

Document: 7-TEXT TEMPLATES
Related Date/Time: Sep-23-2023 (Sat.) 1516
Subject: NON TRAFFIC CITATION DISPOSITION

Non Traffic Citation Disposition

RMS Form Name: NON TRAFFIC CITATION DISPOSITION
Version:      06
Published:    06/08/2020

Adjudication Date:  Aug-09-2023
Investigator:       PORT,B,15298
Citation Number:    N0152267-3
Related Arrestee:
     Or
Business Arrestee:

MDJ Number (No Dashes Ex. 23303):  55401

Adjudication:
          1 - NON APPEARANCE PAID FINE AND COSTS
          2 - FOUND GUILTY
          3 - FOUND NOT GUILTY
      X   4 - PLED GUILTY
          5 - DISMISSED
          6 - ACCELERATED REHABILITATIVE DISPOSITION (ARD)
          7 - PROSECUTION WITHDRAWN
          8 - VOIDED
          9 - NOLLE PROSSE

              Adjudication Reason
   If Adjudication Code of 3, 5, 7, 8 or 9 Is Selected, Complete This Section:

              Additional Comments

          *** End Of Template ***



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT |
|---|---|

**Follow Up Report #3**

| Assigned to: 643889 - TRICK,M,13606 | | Assigned on: Aug-28-2023 (Mon.) 2006 |
|---|---|---|
| Completed: Yes | Approved on: 08/30/2023 | Approved by: MAGGS,R,12646 |

**Narrative Text #1**

**Document:** 3 - OFFICER NARRATIVE

**Related Date/Time:** Aug-28-2023 (Mon.)

**Subject:** VIDEO FILED

On 08/28/23, I received the MASTER CD containing video surveillance for this incident. The master disc will remain at Troop F Headquarters until this case is terminated and the disc can be destroyed.

This concludes this Troopers involvement with this incident.



# PENNSYLVANIA STATE POLICE

### General Offense Report

| GO# PA 2023-896117 | Operational Status: PENDING COURT |
|---|---|

**Related Property Report(s)**

| Total Stolen: $104 | Total Damage: | Total Recovered: |
|---|---|---|

**Property Report #23896117**

| Property Case Status: STOLEN | Related items: 1 |
|---|---|
| Submitted on: Jul-05-2023  (Wed.) | Submitted by: 799829  -  PORT,B,15298 |

**Related Item(s):**

**Articles**
IBR CODE: 08
TYPE: Items listed under Y or not listed in Article Name Dictionary
ITEM: CIGARETTES/CIGARD
COLOR: Red, White
SERIAL #: NA
VALUE: $103.99
# OF PIECES: 1
DESCRIPTION: CARTON OF MARLBORO RED CIGARETTES
RECOVERED VALUE:  $0.00